# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**DORTHA A. BETH,**

        **Plaintiff,**

      **v.**                          **Case No. 06-C-969**

**MICHAEL ASTRUE,**
**Commissioner of the Social Security Administration,**
        **Defendant.**

---

## DECISION AND ORDER

Plaintiff Dortha A. Beth applied for social security disability benefits, alleging that she was unable to work due to mental impairments including bipolar disorder, depression and a learning disability. The Social Security Administration ("SSA") denied her claim initially and on reconsideration, as did an Administrative Law Judge ("ALJ") following a hearing. When the Appeals Council denied her request for review, the ALJ's ruling became the SSA's final decision on plaintiff's claim. See Haynes v. Barnhart, 416 F.3d 621, 626 (7th Cir. 2005). Plaintiff now seeks judicial review of that decision as provided by 42 U.S.C. § 405(g).

## I. APPLICABLE LEGAL STANDARDS

### A. Judicial Review

Under § 405(g), the court considers whether the ALJ's decision is supported by "substantial evidence" and based on the proper legal criteria. Scheck v. Barnhart, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Skinner v. Astrue, 478 F.3d 836, 841 (7th Cir. 2007). In reviewing a decision for substantial evidence, the court may not displace the

ALJ's judgment by reconsidering facts or evidence or making credibility determinations. Id. Nevertheless, the court must conduct a critical review of the record, considering both the evidence that supports, as well as the evidence that detracts from, the ALJ's decision. Briscoe v. Barnhart, 425 F.3d 345, 351 (7th Cir. 2005). Further, the court may not uphold an ALJ's decision, even if there is enough evidence in the record to support it, if the reasons given by the ALJ do not build an accurate and logical bridge between the evidence and the result. Blakes v. Barnhart, 331 F.3d 565, 569 (7th Cir. 2003) (citing Steele v. Barnhart, 290 F.3d 936, 941 (7th Cir. 2002); Sarchet v. Chater, 78 F.3d 305, 307 (7th Cir. 1996)). Similarly, if the ALJ commits an error of law, "reversal is required without regard to the volume of evidence in support of the factual findings." Binion v. Chater, 108 F.3d 780, 782 (7th Cir. 1997).

## B.    Disability Standard

The SSA has adopted a sequential five-step test for determining whether a claimant is disabled. Under this test, the ALJ considers first whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. § 404.1520(b). If not, the ALJ considers whether the claimant has a severe impairment, i.e. one that "significantly limits [the claimant's] physical or mental ability to do basic work activities." § 404.1520(c). If so, the ALJ determines at step three whether the impairment meets or equals any of the Listings found in SSA regulations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. If the claimant's impairment meets or equals one of the Listings, she is deemed disabled. § 404.1520(d). If not, the ALJ determines the claimant's residual functional capacity ("RFC"). RFC is an assessment of the claimant's ability to perform sustained work-related physical and mental activities in light of her impairments. SSR 96-8p. If the ALJ finds at step four that the claimant's RFC does not allow her to perform her past relevant work, the burden shifts to the SSA at step five to prove that in light of the claimant's

2

age, education, job experience and functional capacity to work, the claimant is capable of performing other work and that such work exists in the national economy. Skinner, 478 F.3d at 844 n.1. The SSA may carry this burden by either relying on the testimony of a vocational expert ("VE"), who evaluates the claimant's ability to work in light of her limitations, or through the use of the "Medical-Vocational Guidelines," (a.k.a. "the Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2, a chart that classifies a person as disabled or not disabled based on her exertional ability, age, education and work experience. Patterson v. Barnhart, 428 F. Supp. 2d 869, 872 (E.D. Wis. 2006).

When the claimant alleges disability due to a mental impairment, the ALJ must apply a "special technique." 20 C.F.R. 404.1520a(a). Under this technique, the ALJ first considers whether, under the "A criteria" of the Listings, the claimant has a medically determinable mental impairment. § 404.1520a(b)(1). If so, the ALJ must under the "B criteria" rate the degree of functional limitation resulting from the impairment. § 404.1520a(b)(2). The B criteria have four components: activities of daily living ("ADLs"); social functioning; concentration, persistence or pace; and episodes of decompensation. § 404.1520a(c)(3). The ALJ rates the degree of limitation in the first three areas using a five-point scale: none, mild, moderate, marked and extreme, and the degree of limitation in the fourth (episodes of decompensation) using a four-point scale: none, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity. § 404.1520a(c)(4). Certain Listings may also be met if the claimant has marked limitations in two areas. See, e.g., 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(B).[1] On the other hand, if the

---

[1]Certain Listings also include additional functional elements known as "C criteria."

3

ALJ rates the degree of limitation as "none" or "mild," he may generally find that the claimant has no severe mental impairment. § 404.1520a(d)(1). The ALJ must document application of this technique and include a specific finding as to the degree of limitation in each of the functional areas in his decision. § 404.1520a(e)(2).

If the claimant's mental impairment is severe but does not meet or equal a Listing, the ALJ must assess the claimant's mental RFC. § 404.1520a(d)(3). The mental RFC assessment requires consideration of an expanded list of work-related capacities, including the ability to understand, carry out and remember instructions, and to respond appropriately to supervision, coworkers and customary work pressures in a work setting. Wates v. Barnhart, 274 F. Supp. 2d 1024, 1036-37 (E.D. Wis. 2003) (citing SSR 85-16).

## II. FACTS AND BACKGROUND

### A. Plaintiff's Application and Accompanying Reports

Plaintiff, then age nineteen, applied for benefits on September 10, 2003, alleging an onset of disability as of that date.[2] (Tr. at 54; 381.) In a daily activities questionnaire, plaintiff wrote that she spent most of her time eating, sleeping and watching television, while her mother did the cooking, shopping and household chores. (Tr. at 74-78.) In a disability report,

---

[2]Plaintiff applied for both supplemental security income ("SSI") and childhood disability benefits ("CIB"). SSI is available to disabled adults, regardless of insured status based on their previous earnings, so long as they satisfy a means test. See Blom v. Barnhart, 363 F. Supp. 2d 1041, 1043 n.1 (E.D. Wis. 2005). CIB is available to the dependent, disabled children of insured workers, who (as is relevant here) are eighteen years or older and became disabled prior to age twenty-two. See 42 U.S.C. § 402(d). The ALJ found that both claims failed because plaintiff was not disabled, so I need not further discuss the differences between the two programs. Plaintiff's mother filed a childhood SSI application on plaintiff's behalf in 2001, which was denied. See Baker v. Barnhart, 410 F. Supp. 757, 760-61 (E.D. Wis. 2005) (discussing standards for childhood SSI claims). That application is not before me, but some of the records and reports prepared in connection with it are in the record.

4

plaintiff wrote that she had trouble controlling her anger and lashed out and broke things. (Tr. at 90.) In a function report, plaintiff's mother wrote that plaintiff did little more than eat, sleep and watch television and needed reminders to bathe and groom herself. According to her mother, plaintiff also had trouble lifting and walking, refused to help around the house and fought with other family members. (Tr. at 58-66.) In another function report, plaintiff's friend Christine Werlein wrote that plaintiff spent her time eating, sleeping, watching TV and playing the same movies or music over and over. Werlein further wrote that plaintiff could not care for herself, relied on her mother and had a volatile temper with violent tendencies. Werlein described incidents in which plaintiff tried to cut her mother with a knife and attacked her mother's boyfriend with a hammer. (Tr. at 80-88.)

As noted, the SSA denied plaintiff's claim administratively (Tr. at 383-94), and plaintiff requested a hearing before an ALJ (Tr. at 31). On February 21, 2006, she appeared with a non-attorney representative, Robert Phillips, her county case-worker (see Tr. at 332; 333; 350), for a video-conference hearing with ALJ Donald Willy, who heard the case from Houston, TX. Both the hearing transcript and the ALJ's decision erroneously indicate that Phillips is an attorney. (Tr. at 399; 12.)

## B.    Hearing Testimony

Plaintiff's representative first called plaintiff as a witness. Plaintiff testified that she did not complete school because she hated it and everyone was mean to her. (Tr. at 403-04.) She stated that she had never applied for a job and could not fill out an application by herself. She indicated that she spent her time at home eating, sleeping, watching TV and reading romance novels. If told to, she cleaned up after herself; if not told to, she didn't. (Tr. at 404.) The ALJ asked plaintiff no questions.

5

Plaintiff's representative next called plaintiff's mother, who testified that she had to wake plaintiff in the morning, fix her breakfast, then tell her to brush her teeth and take a shower. She indicated that she had to tell plaintiff to do things step by step, like a child. Plaintiff could not remember where things went in the cupboard and had to be reminded. (Tr. at 405.) She testified that plaintiff was picked on in school and would come home and take it out on her; she stated she was afraid that if plaintiff worked she would take it out on her co-workers. (Tr. at 405-06.) She stated that plaintiff could not live on her own because she could not even make a can of soup, wash dishes or do laundry. (Tr. at 406.)

In response to questions from the ALJ, plaintiff's mother indicated that the household consisted of her, plaintiff and plaintiff's ten year old sister. No one in the household worked. The ALJ asked plaintiff's mother what she did on a daily basis, and she responded: get her daughter off to school, clean the house and take walks. She stated that she did 90% of the household chores herself. The ALJ asked, "basically what's occurring is that you're taking care of your two daughters?" (Tr. at 407.) Plaintiff's mother answered affirmatively. The ALJ said he got "the impression" and ended the questioning. (Tr. at 407.)

The ALJ then called Nancy Durrand, M.D., as a medical expert ("ME"), and she opined that plaintiff had a severe personality disorder with passive, dependent and immature features, which was aggravated by her domestic relationship with her family. (Tr. at 401; 408.) She testified that plaintiff had a meshed relationship with her mother, which helped foster this personality disorder. (Tr. at 409.) Dr. Durrand did not believe plaintiff had bipolar disorder, but did have mood instability and temper problems related to her personality disorder. (Tr. at 401-02; 409.) Dr. Durrand noted that plaintiff's home environment was chaotic, and she had not attempted to work or function in any way other than being dependent. (Tr. at 409.) However,

6

the record did contain school records, which indicated that plaintiff was primarily a C student and not a behavior problem. (Tr. at 409.) Dr. Durrand noted that plaintiff was better able to control herself in the structured environment of school as opposed to the chaotic environment of her home. Thus, she concluded that plaintiff likely could control herself in the more structured environment of work, where her family would not be there to antagonize her. She believed that plaintiff was certainly capable of simple, low stress work. (Tr. at 402; 409.)

Dr. Durrand opined that plaintiff did not meet or equal a Listing. (Tr. at 402; 409.) She indicated that she considered Listing 12.08 based on personality disorder, 12.04 based on possible bipolar disorder, and 12.02 and 12.05 based on learning disabilities. (Tr. at 409-10.) Dr. Durrand opined that plaintiff met the A criteria for Listing 12.08 based on her passive and aggressive behavior, persistent disturbance of mood, and intense and unstable relationships with impulsive and self-damaging behavior. (Tr. at 410.) However, she did not meet the A criteria for any other Listing. (Tr. at 410.) Dr. Durrand did not make specific findings on the B criteria.

Regarding plaintiff's mental RFC, Dr. Durrand opined that plaintiff had a fair ability to follow work rules, relate to co-workers, use judgment, cooperate with supervisors, deal with work pressures, function independently, maintain attention and concentration, maintain personal appearance, behave in an emotionally stable manner, and be reliable. However, she rated as poor plaintiff's ability to deal with the public and follow complex instructions. She opined that plaintiff's ability to follow simple job instructions was good. (Tr. at 411.) Dr. Durrand testified that plaintiff would function better in a job that did not involve confrontation and had only incidental public contact. She would also do better with minimal interactions with co-workers and supervisors, rather than intense cooperative interaction and close supervision.

7

Since she had never worked, Dr. Durrand believed it would be best that plaintiff start in a job without strict production quotas. Based on her medications, Dr. Durrand also believed that plaintiff should not work around hazards or in excessive heat, or engage in commercial driving. (Tr. at 412.)

When asked about plaintiff's ability to maintain her appearance, and specifically plaintiff's mother's testimony that she had to help plaintiff, Dr. Durrand opined that plaintiff had no mental condition rendering her unable to groom; she was not retarded, not psychotic, not manic; she may be depressed at times but not to the point where she could not motivate herself to take a bath. Dr. Durrand opined that this was all related to the bizarre, enmeshed relationship plaintiff had with her mother, not an individual disorder. (Tr. at 414.) Dr. Durrand concluded that plaintiff could engage in competitive work activities if she needed to and was motivated to. (Tr. at 415.) Plaintiff's representative asked the ME no questions. (Tr. at 413-14; 415.)

The ALJ then called a VE, who opined that based on the psychological profile from Dr. Durrand plaintiff could perform jobs such as maid, hand packager and food preparation worker. (Tr. at 416.) The VE further stated that, since she had never worked, in an "ideal world" plaintiff would initially work in a sheltered workshop or through a work adjustment program for about six months. (Tr. at 418.) Plaintiff's representative asked the VE no questions. (Tr. at 419.)

Before closing the hearing, the ALJ afforded plaintiff a chance to say more, and she told her representative that she hated the ALJ and wished he were dead. With that, the hearing closed. (Tr. at 419-20.)

8

**C.    Documentary Evidence**

**1.    School Records**

According to her school records, plaintiff was retained in the first grade.  Two years later, in 1993, a Multi-disciplinary Team ("M-Team") recommended that she receive special education services.  The M-Team continued learning disability ("LD") and speech and language services in 1996.  (Tr. at 134.)  According to a three year evaluation completed by the M-Team in 1999, when plaintiff was in the eighth grade, she had been "mainstreamed" for her entire schedule, with assistance from the LD teacher in the study center.  (Tr. at 134, 143.)  Plaintiff's science teacher indicated that plaintiff was passing based on hard work.  Her LD teacher indicated that plaintiff had great difficulty with organization and over-compensated with almost compulsive academic behavior.  (Tr. at 134.)  The LD teacher further wrote that plaintiff tried her best and always turned in her work.  (Tr. at 144.)  The M-Team noted that plaintiff continued to have difficulty with peers (Tr. at 135), and the LD teacher wrote that peers often made fun of her and she responded inappropriately, but she was not generally a behavior problem (Tr. at 144). Plaintiff's English teacher also indicated that while plaintiff was slower than her classmates, she worked hard, finished her assignments on time and had excellent behavior.  (Tr. at 150-51.) Her math teacher similarly wrote that plaintiff behaved well and had a positive attitude but needed to improve her note taking.  (Tr. at 153.)  The school psychologist indicated that plaintiff's intellectual functioning, reading and math skills were in the low-average range (Tr. at 139), but testing revealed significant emotional issues (Tr. at 140).  The M-Team concluded that plaintiff continued to have special education needs based on a learning disability.  (Tr. at 135.)  The M-Team recommended an LD teacher work with plaintiff in the regular education

9

classroom and further suggested that plaintiff's family consider counseling to deal with family issues and improve social skills. (Tr. at 135-36.)

## 2. Psychiatric Treatment Records

### a. Psychiatric Services of Racine

In 2000, plaintiff started psychiatric treatment with counselor Carol Baird, MSN, RN, and Dr. R.S. Callaghan at Psychiatric Services of Racine, which included therapy and medication. A July 5, 2000 note indicated that plaintiff's home situation was much improved (Tr. at 166), but she failed to appear for her October 2, 2000 appointment (Tr. at 166). On October 13, the counselor noted that plaintiff had some problems with hitting and throwing things and forgetting things while on the medication Celexa. Dr. Callaghan switched her to Effexor and diagnosed depressive disorder, not otherwise specified ("NOS"). (Tr. at 165.) When plaintiff returned on November 13, Dr. Callaghan noted that plaintiff had some difficulty being compliant with her medication regimen, with continued mood lability. Dr. Callaghan switched her to Seroquel. (Tr. at 165.) On November 20, plaintiff reported some problems sleeping but felt calmer on Seroquel. The doctor continued the medication. (Tr. at 164.)

On December 12, plaintiff appeared very distressed and had not been taking her anti-depressants due to a sore throat. The doctor renewed her medications and provided a forty-five minute supportive session. (Tr. at 164.) Plaintiff failed to show for her January 2, 2001 session. (Tr. at 163.) On January 3, 2001, plaintiff's mother indicated that plaintiff was mean, disrespectful and angry, and had been non-compliant with her medication. The counselor discussed these issues with plaintiff, who left in a calm mood. (Tr. at 163.) On January 20, plaintiff's mother indicated that plaintiff continued to be rude. The counselor provided support

10

and encouragement and worked on communication skills. (Tr. at 162.) On January 25, plaintiff reported being teased at school but getting along better with her grandmother except for one explosive episode where plaintiff slapped her grandmother. (Tr. at 162.) On February 6, plaintiff reported slapping a boy two weeks previously and had been forgetting to take her medication. She failed to appear for her February 22 and March 6 sessions. (Tr. at 161.) She appeared in tears on March 14, stating she wished she had never been born, and reported further conflict with her mother. After further discussion she calmed down and reported good grades at school and some social activities with friends. (Tr. at 160.)

On April 12, 2001, plaintiff appeared with her grandmother (who had agreed to bring her to future sessions) and reported fighting with her father. The counselor discussed ways to channel anger. Plaintiff reported being out of medication for three weeks and was provided samples. (Tr. at 159.) On May 10, plaintiff discussed school issues and stated that her mother was taking her to buy a car after she passed her driver's exam. (Tr. at 159.) On May 16, plaintiff reported some arguments with her mother but no trouble at school. Her medications were continued. (Tr. at 158.) On June 14, plaintiff appeared with her mother, who reported that plaintiff remained angry and explosive towards everyone. (Tr. at 158.) On July 11, plaintiff reported that some of her belongings and her medication were destroyed in a fire. She also stated that she went without medication because her parents would not pick it up. The counselor worked with her on anger management issues. (Tr. at 157.) Plaintiff returned on August 16, and her medications were continued. (Tr. at 158.) On August 21, plaintiff's mother entered alone and asked that plaintiff be "committed" because she could not deal with her. The counselor explained that there were no grounds for hospitalization because plaintiff was not suicidal or homicidal. Plaintiff then entered the session upset with her mother, stating that her

11

mother had threatened to kill her. The counselor indicated that "this has been the way these two relate since their first sessions over a year ago. They are very similar personalities." (Tr. at 157.) After a supportive session, plaintiff left in a better mood. (Tr. at 157.) Plaintiff failed to appear for her appointment on September 20, 2001, her sixth no-show (Tr. at 156), and on October 4 she was terminated from treatment for failure to appear. (Tr. at 155.)

On November 14, 2001, Ms. Baird completed a psychiatric questionnaire indicating that plaintiff's diagnosis was depressive disorder, NOS. She indicated that plaintiff's mood varied from session to session, but she was unable to describe any disturbance in memory or concentration. (Tr. at 167.) She indicated that plaintiff often became angry and raised her voice, especially when with her mother. She reported that plaintiff often dressed sloppily but noted no hygiene problems. She wrote that plaintiff was very limited in outside activities, had poor medication compliance and very poor social skills. (Tr. at 168.) She stated that plaintiff was able to express her concerns but unable to change or make better choices. In sum, plaintiff presented as cognitively delayed and somewhat immature, with a questionable prognosis due to poor compliance with medication and poor progress in counseling. (Tr. at 169.)

### b. Southeastern Covenant Behavioral Health

In late 2001 and early 2002, plaintiff received psychiatric treatment at Southeastern Covenant Behavioral Health. During an initial mental health assessment, plaintiff was noted to be in moderate distress but with clean hygiene. She appeared to vacillate between appearing sad/depressed, anxious and angry/hostile. (Tr. at 197.) Her insight, memory and judgment were rated as "fair." She reported being angry about her parents and school. (Tr. at 197.) In a November 14, 2001 note, Dr. Ilva Van Valkenburgh noted that plaintiff continued

12

to have angry outbursts with her mother and sister. Her grooming was impaired and her mood dysphoric. The doctor assessed plaintiff with bipolar disorder and prescribed a new medication. (Tr. at 195.)

On January 2, 2002, plaintiff reported feeling calmer and her mother also reported decreased anger and mood swings. Plaintiff's mood was mildly dysphoric. Dr. Van Valkenburgh's assessment was bipolar disorder, improved. The doctor adjusted plaintiff's medication and scheduled her for a follow up in one month. (Tr. at 194.)

On February 6, plaintiff reported doing better overall, but she still had one significant anger outburst the previous night. Plaintiff admitted only partial compliance with her medication regimen. Her mood was somewhat dysphoric and her insight remained extremely poor. Dr. Van Valkenburgh found plaintiff's condition not much improved and increased her medication dosage. (Tr. at 193.)[3]

### c. Racine Counseling Center

Plaintiff next received treatment at the Racine Counseling Center in 2003. According to a January 8, 2003 assessment, plaintiff became angry when she did not get her way and refused to clean her room and attend to her personal care. (Tr. at 270.) A February 6 progress note indicated that there had been no change in plaintiff's condition, and that her GAF was 65,[4]

---

[3]Records from the Alternberg Clinic indicate that plaintiff received medications, including Seroquel, Effexor, Depakote and Tegratol, in late 2002. (Tr. at 266-68.)

[4]GAF stands for Global Assessment of Functioning. Set up on a 0-100 scale, scores of 91-100 are indicative of a person with no symptoms, while a score of 1-10 reflects a person who presents a persistent danger of hurting herself or others. As is relevant to this case, scores of 61-70 reflect "mild" symptoms, 51-60 "moderate" symptoms, 41-50 "severe" symptoms and 31-40 a "major impairment." Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32-34 (4th ed. 2000).

13

indicative of mild symptoms.[5]  (Tr. at 290.)  A February 21 progress note indicated that plaintiff

was working on better anger management, with a GAF of 59.  (Tr at 285.)  On March 6, plaintiff

continued to work on anger management, and her GAF remained 59.  (Tr. at 284.)  On March

20, plaintiff appeared more calm, but her mother reported losing control more often, including

an incident in which she (the mother) injured herself punching a wall; plaintiff had been helping

out more around the house as a result of her mother's injury.  (Tr. at 283.)  On April 1, plaintiff

and her mother appeared less combative.  The mother attempted to start an argument, but

plaintiff was able to remain calm and de-escalate the situation.  Plaintiff continued to have

issues with her mother's boyfriend, but her physical and verbal aggression was diminished.

Her GAF was 61, indicative of only mild symptoms.  (Tr. at 282.)  During the April 15 session,

plaintiff and her mother got into a shouting match, which ended when plaintiff's mother

indicated that she hated plaintiff and wished she was never born, then stormed out.  After her

mother left, plaintiff described a history of physical abuse by her mother.  Her GAF was 56.  (Tr.

at 281.)

On April 29, plaintiff continued to appear more stable in mood and was feeling an

increased sense of self-esteem, but her mother continued to escalate and become verbally

abusive.  Plaintiff's GAF remained 56.  (Tr. at 280.)  On May 13, plaintiff and her mother

appeared more stable with improved communication and fewer arguments.  (Tr. at 279.)

However, by June 13 things had fallen apart between the two, and plaintiff's mother had thrown

plaintiff out of the house.  Nevertheless, the two continued to come to counseling together, and

plaintiff's mother became abusive during the session, forcing the counselor to ask her to leave.

---

[5]The provider's notes from this session are difficult to read, but it appears plaintiff was
provided medications including Effexor and Depakote.  (Tr. at 290-95.)

14

Plaintiff had stopped going to school for the previous three weeks and consequently did not receive her diploma. Her GAF was rated as 52. (Tr. at 278.)

On June 22, plaintiff reported depression and lots of anger. (Tr. at 286.) She appeared by herself on June 27, less agitated, and the counselor discussed methods of coping and de-escalating conflicts. Plaintiff's GAF improved to 57. (Tr. at 277.) On July 14, plaintiff's father called and indicated that plaintiff had no insurance and could not continue in treatment. (Tr. at 276.)

### d. St. Luke's Medical Hospital

On October 16, 2003, plaintiff was admitted to the St. Luke's psychiatric unit after threatening her mother's boyfriend with a hammer. The admission note indicated that plaintiff had a history of mood instability and had stopped medications in June due to lack of funding. She reported wanting to kill her mother's boyfriend, whom she said was physically abusive, but had no thoughts of harming anyone else. She described low energy, racing thoughts and difficulty controlling her actions. (Tr. at 302.) On mental status exam, plaintiff was alert, somewhat cooperative, with somewhat rapid speech. Her mood was angry, her insight fair and her judgment intact. She had no physical complaints. (Tr. at 303.) Dr. W. J. Bjerregaard's assessment was bipolar disorder, mixed state, multiple learning disabilities with limited intellectual abilities, and obesity, and he started plaintiff back on Depakote, Seroquel and Resperdal. (Tr. at 303-04.)

Dr. G. L. Brown also examined plaintiff, and plaintiff expressed a great deal of anger during the interview and was relatively abusive. Dr. Brown admitted her to the hospital in stable condition. (Tr. at 298.) Plaintiff was discharged on October 20, 2003. Her medication had been re-started and she reported sleeping better with less irritability. Prior to discharge, plaintiff

15

had a family session with her mother, and it was hoped she could return to live with her mother and cope with family difficulties through counseling at Racine Psychological Services. At the time of discharge, plaintiff no longer had thoughts of harming anyone, including her mother's boyfriend. (Tr. at 300.) She was discharged with a one month supply of Depakote, Seroquel and Risperdal. Her prognosis was guarded, and she was scheduled to follow up with Racine Psychological Services. (Tr. at 301.)

      **e.**    **Racine Psychological Services ("RPS")**

On November 13, 2003, D. Martin Hayden, Ph.D. of Racine Psychological Services conducted an intake interview with plaintiff. Dr. Hayden wrote that plaintiff was originally seen by Dr. Hewitt for intake on October 21, but became agitated, threatened to kill her mother and left the office before the assessment was complete. Her mother later called and requested another therapist. (Tr. at 326; 325.) Based on history, Dr. Hayden noted that plaintiff had no behavior problems at school, only at home, which suggested that she did better in a more structured setting. Plaintiff insisted on being seen with her mother at both appointments, and her mother tended to answer questions for her. During the interview with Dr. Hayden, plaintiff remained calm, but her mother became agitated, raising her voice to almost a shout within a few minutes. Dr. Hayden noted clear tension between plaintiff and her mother. Plaintiff presented in very casual dress and her grooming was below average. (Tr. at 327.) Dr. Hayden's diagnostic impression was rule out depressive disorder, other pathology and personality disorder, with an estimated GAF of 55. (Tr. at 328-29.) Because she had been helped by psychotropic medications in the past, Dr. Hayden referred plaintiff to psychiatrist Arun Parikh. Dr. Hayden concluded that he wanted to be careful in not stigmatizing plaintiff with a mental illness diagnosis at this point in her life, as it appeared that her problems may be

16

related to her chaotic family situation. He noted that the fact that she behaved reasonably well in school suggested that she had more voluntary control over her behavior than she would have others believe. (Tr. at 329.)

On November 17, 2003, plaintiff's mother called RPS and handed the phone to a friend, who stated that plaintiff was out of control, threatening and abusive. She was advised to call the police if and when safety became an issue. (Tr. at 325.) Plaintiff was seen for counseling on November 20, but cancelled her December 5 appointment. (Tr. at 324.) Plaintiff saw Dr. Parikh on December 9, insisting that her mother sit in. Plaintiff reported sleeping up to sixteen hours per day and stated that her biggest problem was that her father announced that he was gay, causing her to demand he choose between her or his male partner. On mental status exam, Dr. Parikh found plaintiff rather simplistic and childish, and very keen on telling her story in a loud and dramatic manner. (Tr. at 317.) There was no overt evidence of psychosis or mood disorder, and no psychomotor agitation. At times, plaintiff wanted her mother to answer for her, but Dr. Parikh redirected her to answer herself. Dr. Parikh opined that it appeared very likely plaintiff's problems were more characterological rather than the result of major mental illness. Dr. Parikh's diagnoses were impulse control disorder, NOS, and personality disorder, NOS, with a GAF of 60. He continued her medications – Resiperodal, Seroquel and Depakote – with modified dosages. (Tr. at 318.)

On December 11, Dr. Hayden saw plaintiff and her mother, and delved into plaintiff's interests and activities, which included eating, watching TV, interacting with pets, listening to music and sleeping. She slept for about twelve hours per day, arising between 1:00 p.m. and 3:00 p.m. and was under no pressure to engage in constructive, productive activity. Dr. Hayden noted that the interaction between plaintiff and her mother seemed more like peers

17

than a mother-daughter relationship.  He further noted that plaintiff visited her father on weekends and was obligated to follow a different routine there, arising at 8:00 a.m. and engaging in other activities.  Dr. Hayden noted that except for the immaturity and dependence on her mother, plaintiff's behavior was reasonably appropriate.  She showed no abnormality of mood or cognition.  (Tr. at 323.)

Plaintiff returned to Dr. Hayden on December 23 and reported that her grandmother had recently died.  Plaintiff and her mother argued over a small insurance policy the grandmother had left, with the mother readily escalating to loud tones; plaintiff remained relatively calm.  Plaintiff was to bring her father to the next session.  (Tr. at 321-22.)

On January 5, 2004, plaintiff saw Dr. Parikh and appeared pleasant and appropriate, with no overt psychosis, mood disorder or dysphoria.  Dr. Parikh continued her medications, including Risperidone, Depakote and Seroquel.  (Tr. at 321.)

Plaintiff returned to Dr. Hayden on January 13, along with her father and two sisters.  Plaintiff's father reported that plaintiff was usually angry, wanted to control activities and generally created problems while visiting.  Plaintiff stated that she wanted to make her father as unhappy as possible and get away from her mother at the same time.  Plaintiff refused to help out or do any chores at either home.  Plaintiff's father indicated that her medication contributed to extended sleeping but failed to keep her calm when she did not get her way.  Dr. Hayden concluded that plaintiff's behavior suggested immaturity, egocentricity and lack of motivation for change.  (Tr. at 320.)

On January 22, plaintiff appeared unexpectedly because Dr. Hayden had been advised that she was incarcerated at the Racine County Jail following an argument with her mother, during which her mother armed herself with a knife.  Both were arrested and a no contact order

18

issued. Plaintiff was at the time staying with her father. Dr. Hayden discussed the argument and what action plaintiff might have taken to avoid violence. Plaintiff reported taking her medication as prescribed. (Tr. at 319.)

Plaintiff returned on January 30 and reported feeling anxious to leave her father's home. She also reported conflict with her sixteen year old sister, who also lived there. (Tr. at 316.) During her next appointment on February 11, she told Dr. Hayden that she never wanted to grow up. She stated that she needed someone to help take care of her and had no desire to live on her own. Dr. Hayden believed that plaintiff would benefit from a living skills program, but her mother had apparently reinforced the idea that she was not capable of learning. (Tr. at 315-16.)

On February 23, plaintiff returned with her father and reported continued conflict with her sister. Plaintiff's father indicated that she may have to return to her mother's home, and Dr. Hayden noted that the fact that her mother – herself on SSI for depression – was not in treatment was not promising. Dr. Hayden also noted concern with violence between plaintiff, her mother and her mother's boyfriend. Plaintiff expressed a belief that she suffered brain damage from a childhood fever, which Dr. Hayden believed may reduce plaintiff's acceptance of responsibility for her behavior. (Tr. at 314.)

Plaintiff saw Dr. Parikh with her mother on March 5, and he viewed them both as intellectually challenged, with low frustration tolerance and poor psycho-social skills. Dr. Parikh continued to believe that plaintiff did not have a major mental illness but rather behavioral problems secondary to intellectual deficits and poor social skills. (Tr. at 312.)

On March 8, plaintiff saw Dr. Hayden and reported that she had returned to her mother's home as of February 27. Plaintiff's mother complained that plaintiff did nothing around the

19

house, and plaintiff did not deny it. Dr. Hayden suggested having a caseworker assigned who would start plaintiff in an independent living program, learning basic self-care skills. Plaintiff agreed. (Tr. at 313.) Plaintiff's mother called on March 10, stating that plaintiff was out of control and could not stay. Dr. Hayden called social services about arranging an alternate placement for plaintiff. (Tr. at 313.) The following day, a social worker called about the case and assigning a caseworker. (Tr. at 312.)

On March 23, plaintiff and her mother returned to Dr. Hayden, and the two argued loudly and repeatedly. (Tr. at 312.) Dr. Hayden facilitated a discussion about how to improve the situation but came to the conclusion that things were unlikely to change and that there was little to do other than recommend a placement outside the home. He provided the number for the county social worker. (Tr. at 311.)

Plaintiff again returned with her mother on April 14, and her mother reported that plaintiff had behaved unusually well and been more compliant and less volatile. (Tr. at 311; 379.) Plaintiff reported a fight with her father and stated that she wanted to get back at him for destroying her life. Dr. Hayden tried to help her see how this was a self-defeating strategy and could result in her being forbidden to see her father. Plaintiff responded that she would break the door down if she had to and became agitated. Dr. Hayden encouraged her to think about it. Plaintiff had gone to "Harbor House" – apparently a transitional living space – but left because she did not like having to help clean the place. (Tr. at 310; 378.)

Plaintiff returned on April 28, and her mother complained about her body odor and refusal to bathe more often. Plaintiff's mother also reported an incident in which plaintiff punched her father. Plaintiff stated that she must have her way and will use violence if anyone resists. (Tr. at 310; 378.) Both were shouting during the session, and Dr. Hayden noted that

20

plaintiff seemed to ignore any boundaries set by others. Plaintiff and her mother met with the county worker, but there was no discussion of placement outside the home. Dr. Hayden concluded that this was not a case where traditional therapy would be helpful because plaintiff was not interested in changing, and her mother's home was not a suitable environment for her to develop maturity. (Tr. at 309; 377.)

On May 14, plaintiff stated that her mood had been up and down. Her mother indicated that she believed plaintiff had type II diabetes. Plaintiff did not seem to understand the seriousness of the disease, and Dr. Hayden explained the quality of life and life-span issues involved. Dr. Hayden surmised that plaintiff's hyperglycemia might be contributing to her fatigue, excessive sleep and low motivation. (Tr. at 308; 376.) Plaintiff also saw Dr. Parikh on May 14, and he adjusted and continued her medications. (Tr. at 307; 375.) Plaintiff cancelled her session with Dr. Hayden on June 4. (Tr. at 307; 375.)

Plaintiff and her mother returned to Dr. Hayden on June 11, and reported that plaintiff had threatened her cousin and father with a knife, resulting in her father putting her out of the house. Plaintiff's mother continued to complain that plaintiff was not helping out. (Tr. at 375.) Dr. Hayden reviewed plaintiff's daily activities, which including rising in the night to eat and watch TV, and sleeping about ten hours per day. Dr. Hayden further discussed plaintiff's health risks related to obesity, including diabetes. Based on a blood sugar test done by plaintiff's mother, it appeared to Dr. Hayden that plaintiff already had diabetes. He opined that this could be complicating the clinical picture and urged her to obtain medical care. (Tr. at 374.)

On July 2, plaintiff and her mother arrived twenty-five minutes late and arguing. Plaintiff's father had been unwilling to allow her to stay very long after she threatened to slash his tires. Plaintiff's mother was insistent that plaintiff move out but stated that she could stay

21

if she received social security. Plaintiff stated that she would not move out. When asked what she would do with social security benefits, plaintiff stated that she would spend the money on pleasure, like summer vacations, and her mother seemed to encourage this idea. Dr. Hayden wrote that plaintiff's mother would not be an acceptable protective payee. (Tr. at 373.)

On July 19, plaintiff reported that her medication had helped keep her calm, but her mother disagreed. Plaintiff indicated that an old boyfriend had called, and she stated she would like to see him again. Dr. Hayden again stressed the importance of plaintiff obtaining treatment for possible diabetes, as nothing had been done in that regard. Dr. Hayden further noted that there was no shouting during the session, which was unusual. (Tr. at 372.)

On July 26, plaintiff's father came in and reported that plaintiff showed no interest in living independently, learning skills, losing weight or exercising. (Tr. at 371.) Plaintiff returned on August 2 and indicated that she had been denied SSI. Dr. Hayden suggested a DVR evaluation and curative workshop. There seemed to be less escalation between plaintiff and her mother, but there was no mention of plaintiff making efforts to live more independently. Plaintiff's mother indicated that plaintiff could not even remember where things were kept in the kitchen, and it seemed likely plaintiff encouraged this impression of helplessness to maintain the status quo. (Tr. at 370.) Plaintiff failed to appear on August 19. (Tr. at 370.)

Plaintiff saw Dr. Parikh by herself on August 13 and appeared pleasant and appropriate, reporting no new emotional problems. Her mood was euthymic, and Dr. Parikh continued her medications. (Tr. at 367.)

On August 31, plaintiff and her mother returned to Dr. Hayden, and plaintiff's mother almost immediately began crying and launched an attack on plaintiff. (Tr. at 369-70.) Plaintiff had not been taking her medication, stating that water made her sick to her stomach and no

22

other beverages were available. She also had done nothing about her diabetes. (Tr. at 369.) On September 21, plaintiff's mother initially refused to speak, then became upset, shouting insults and obscenities at plaintiff until Dr. Hayden asked her to leave. Plaintiff nevertheless seemed unprepared to leave her mother's home, where most everything was done for her. (Tr. at 368.) Dr. Hayden indicated that treatment seemed unlikely to dislodge plaintiff from the extremely dependent niche she occupied in her parents' lives and homes. (Tr. at 367-68.)

On October 19, plaintiff returned to Dr. Hayden with her father and again rejected the idea of leaving her mother's home. Dr. Hayden discussed plaintiff's tendency to live in a fantasy world and encouraged her to experience more personal growth and shed the idea that her family could or should be reunited. (Tr. at 366.)

On November 16, plaintiff and her mother reported getting along better, and plaintiff was helping more around the house and bathing daily. (Tr. at 365.) On November 29, plaintiff saw Dr. Parikh, and she and her mother both appeared remarkably calmer. The mother praised plaintiff for helping more. Dr. Parikh discontinued a.m. Risperidone to reduce the amount of sleep, but continued the other medications. (Tr. at 364.) On December 14, plaintiff's mother again told Dr. Hayden that plaintiff was more and more helpful at home (Tr. at 365), and Dr. Hayden was puzzled as to what had led to this progress (Tr. at 363).

On January 18, 2005, plaintiff and her mother told Dr. Hayden that they continued to get along, aside from one violent episode. However, plaintiff still had not seen a doctor about her probable diabetes. Dr. Hayden further noted that neither seemed ready to make real changes in their symbiotic relationship. (Tr. at 361-62.)

On February 28, plaintiff and her mother reported continuing to get along, although plaintiff had been in a physical fight with her father. Plaintiff continued to show little awareness

23

of and made no attempt to address her health issues. (Tr. at 361.) Dr. Hayden addressed plaintiff's lack of drive to become more independent, which was her most significant problem. (Tr. at 360.)

Plaintiff saw Dr. Parikh on March 7, with her father. Dr. Parikh opined that plaintiff continued to progress quite well. She was more focused, less impulsive and her speech more directed. Plaintiff reported feeling more alert in the daytime with the reduction in Risperidone. Dr. Parikh continued her medications. (Tr. at 360.)

On April 4, plaintiff returned to Dr. Hayden and reported finally seeing a nurse practitioner about her diabetes, for which she was started on glucophage. (Tr. at 360.) Plaintiff continued to display emotional lability and immaturity, with a very egocentric orientation. She expressed anger at her father and sister, but was more controlled in such expression. (Tr. at 359.)

Plaintiff returned to Dr. Parikh on May 9 and asked to be taken off Risperidone, as it was increasing her blood sugar. She continued to have issues with her mother, but her overall agitation was lessened. Dr. Parikh reduced Risperidone and continued her other medications. (Tr. at 359.)

On May 16, plaintiff told Dr. Hayden she was fine, but her mother reported that she continued on a poor diet with no exercise and high blood sugar levels. Dr. Hayden again suggested that plaintiff move into a supervised living program, but plaintiff refused and her mother would not force the issue. (Tr. at 358.) Plaintiff failed to appear to see Dr. Hayden on July 5 and Dr. Parikh on July 18. (Tr. at 356.) On July 20, plaintiff reported losing weight and eating a better diet. Her mood was euthymic and she showed no angry outbursts. (Tr. at 355-56.) In a July 20, 2005 treatment plan review, Dr. Hayden indicated that the goal of increasing

24

impulse control and reducing violence was partially complete, and treatment to encourage independent living continued.  (Tr. at 357.)

Plaintiff saw Dr. Parikh on August 8 and reported doing more things around the house. Her past explosive behavior was decreasing.  Dr. Parikh prescribed Lunestra to help plaintiff sleep and continued Depakote.  (Tr. at 355.)  Plaintiff failed to appear for her appointment with Dr. Hayden on August 31.  (Tr. at 354.)

On September 13, plaintiff and her mother advised Dr. Hayden of renewed conflict. Plaintiff was unwilling to enter any programs to develop independent living skills, so Dr. Hayden doubted there was any significant benefit in continued sessions.  (Tr. at 354.)  Dr. Parikh's September 20 note indicated his agreement with Dr. Hayden that plaintiff did not need further psychotherapy at RPS, and Dr. Hayden referred plaintiff and her mother to a United Way agency for family therapy.  (Tr. at 353.)  However, the two appeared again on October 12, to Dr. Hayden's surprise.  Plaintiff and her mother both reported surprising improvement in their relationship.  (Tr. at 353.)  Plaintiff's mother attributed the improvement to more cooperation on plaintiff's part and her throwing her drug abusing boyfriend out of the home.  (Tr. at 352-53.) Dr. Hayden seemed skeptical but delayed the referral for family therapy and scheduled another appointment for two months.  Plaintiff cancelled the December 14 session due to inclement weather.  (Tr. at 352.) On December 19, plaintiff appeared with her mother and the two argued again.  Dr. Hayden ended the session when plaintiff's mother launched into an unprovoked tirade about her ex-husband and how she wished plaintiff was never born.  Dr. Hayden suggested she return to treatment, but she rejected the idea and had apparently allowed her boyfriend back in the house.  (Tr. at 397.)  Dr. Hayden continued to advise plaintiff to move out, but she would not consider it.  (Tr. at 396-97.)  Plaintiff was scheduled for February 19, 2006,

but denied she had an appointment when called to confirm. (Tr. at 396.)

### 3. Treating Source Reports

On April 19, 2004, Dr. Hayden wrote a letter to plaintiff's social security representative, indicating that her diagnoses were impulse control disorder, NOS, and personality disorder, NOS, with explosive, dependent and immature features. He indicated that she was on medications, but there was some doubt as to their appropriateness and benefit. He stated that plaintiff's primary need was to develop more social skills and emotional maturity. (Tr. at 306.

On July 2, 2004, Dr. Hayden completed a questionnaire in which he indicated that plaintiff's hygiene was adequate, but her mother reported that she bathed infrequently. He stated that her memory, concentration and attention appeared to be average. He wrote that she ordinarily was calm in their sessions, unless her mother said something disagreeable, in which case she would raise her voice and the dispute would escalate between the two. (Tr. at 235.) He stated that she was otherwise respectful and cooperative in their sessions. He indicated that despite getting a total of ten hours of sleep per day, she appeared fatigued, and he had encouraged her to get treatment for probable type II diabetes. He wrote that she had been obese for years and did not seem bothered by that. He stated that plaintiff was an immature young adult who was the product of a dysfunctional family, in which her mother and grandmother over-indulged her and did not hold her accountable for her own behavior. (Tr. at 236.) He further indicated that she did not view work as a duty or responsibility and believed her parents owed her whatever she wanted. He also indicated that there was a history of police involvement due to domestic disturbances at plaintiff's home. Dr. Hayden stated that he had asked the county social services department to arrange placement for plaintiff elsewhere due to the "negative symbiosis" between plaintiff and her mother. (Tr. at 237.)

26

On July 2, 2004, Dr. Parikh completed a psychiatric questionnaire, indicating that his diagnoses were impulse control disorder and personality disorder with dependent, explosive and immature features. He described plaintiff as fully oriented, with some emotional volatility. He observed no disturbances in memory and found her thought processes conventional and cohesive. (Tr. at 238.) He also found no symptoms of depression and opined that her low energy level and limited activities may reflect other medical conditions. He indicated that her grooming and dress were casual, but this was probably habitual and indicative of family patterns. He noted that her interests were limited, but again this was habitual rather than regressive, as plaintiff preferred to eat, sleep, watch TV and listen to music. She had little goal directed behavior and lived according to the pleasure principle, refusing to help around the house unless pressed by her mother. (Tr. at 239.) He described her relations with others as immature and egocentric. He indicated that treatment had helped slightly with what seemed primarily to be characterological problems. He rated her ability to understand, remember and carry out instructions as low average, and her ability to respond to others as poor due to her egocentric, rebellious and oppositional personality style. (Tr. at 240.)

On August 2, 2004, Dr. Hayden completed another form report in which he indicated that plaintiff had a fair ability to function independently but wrote "no relevant findings" in the other occupational abilities listed on the form. (Tr. at 46.) He further wrote that plaintiff was very dependent on her parents to do "almost everything for her" and "prefers to keep it that way, it seems." (Tr. at 46.) He rated plaintiff's ability to understand, remember and carry out complex and detailed job instructions as "limited but satisfactory," and her ability to understand, remember and carry out simple job instructions as "unlimited/very good." (Tr. at 45.) He rated her ability to relate to others and demonstrate reliability as good to fair but noted her volatile

27

temper, limited grooming skills and immature behavior. (Tr. at 45.) He noted no other work-related impairments and stated that she could manage her own benefits. (Tr. at 45; 331.)

### 3. Consultants' Reports

The SSA arranged for plaintiff to be examined or evaluated by several sources in connection with her 2001 and 2003 applications for benefits.

#### a. 2001 Application

On December 17, 2001, Richard Fogle, Ed. D. examined plaintiff (who was seventeen years, ten months old at the time (Tr. at 177)), finding her to be cooperative and coherent in her responses, but with variable mood including a great deal of anger and irritability (Tr. at 175-76). On testing, plaintiff scored in the borderline range of intellectual functioning (Tr. at 176), and her academic skills were well below average for her grade placement (Tr. at 177). Dr. Fogle concluded that plaintiff was in need of psychiatric treatment and had significant difficulty relating to others, coping with normal stress and maintaining an emotionally stable demeanor. (Tr. at 178.) He diagnosed a learning disorder, oppositional defiant disorder and mood disorder, with a GAF of 40, and concluded that with regard to her general ability to understand, remember and carry out instructions, plaintiff had significant problems in completing age appropriate tasks. (Tr. at 179.) Although he found no significant problems in concentration and attention, it appeared that motivation, sustainability and pace were all problematic for plaintiff. Her ability to withstand stress and adapt to change was poor, and her social adjustment with peers was notably problematic. (Tr. at 179.)

On March 21, 2002, Dr. Roger Rattan completed a childhood disability evaluation form, in which he indicated that plaintiff suffered from oppositional defiant disorder and borderline

28

intellectual functioning, impairments that were severe but which did not meet or equal a Listing. (Tr. at 180.) Under the "domains" used to evaluate childhood disability claims, Dr. Rattan found no or less than marked limitations in all six areas.[6] (Tr. at 182-85.) Dr. Jean Warrior completed a similar report, opining that plaintiff additionally suffered from a learning disability and mood disorder, but agreeing with Dr. Rattan that none of plaintiff's impairments met or equaled a Listing, and that she had less than marked or no limitation in the six domains. (Tr. at 186-91.) Dr. Warrior noted that plaintiff's primary problem seemed to be anger and aggression towards her mother, and that she had no problems other than at home. (Tr. at 191.)

Dr. Rattan also completed a Psychiatric Review Technique Form, evaluating plaintiff as an adult, concluding that her severe mental impairments also did not meet the adult Listings. Under the B criteria, he found mild limitations in ADLs and concentration, moderate limitations in social functioning, and no episodes of decompensation. (Tr. at 203-13.) In an accompanying mental RFC report, Dr. Rattan found that plaintiff was not significantly or only moderately limited in all of the listed areas. (Tr. at 199-200.)

### b. 2003 Application

In February 2004, Jack Spear, PhD., completed a Psychiatric Review Technique Form, concluding that plaintiff had severe mental impairments, including depressive and personality disorders, neither of which met a Listing. He opined under the B criteria that plaintiff had mild

---

[6]As noted, plaintiff was at the time of this application seventeen years old. The SSA decides a child's disability claim by evaluating her degree of limitation (i.e., extreme, marked, less than marked, or no limitation) in six "domains": (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. If the child-claimant has "marked" limitations in two domains or an "extreme" limitation in one domain, she is considered disabled. 20 C.F.R. § 416.926a.

29

to moderate limitations and one or two episodes of decompensation. (Tr. at 217-27.) In an accompanying RFC report, Dr. Spear rated plaintiff as not significantly or moderately limited in all of the listed areas. (Tr. at 231-32.)

On July 16, 2004, Keith Bauer, PhD., completed a Psychiatric Review Technique form, finding that plaintiff had severe impairments of bipolar disorder, learning disability, and impulse control and personality disorders. However, he rated her as only moderately impaired in the first three B criteria with no episodes of decompensation, meaning she did not meet a Listing. (Tr. at 241-51.) In an accompanying mental RFC report, Dr. Bauer rated plaintiff as moderately limited in most areas, not significantly limited in the remainder. (Tr. at 256-57.)

Finally, in a Childhood Disability From completed on July 16, 2004, Pat Chan, MD, concluded that plaintiff had severe mental impairments, including mood disorder, oppositonal defiant disorder, learning disability, borderline intellectual functioning and bipolar disorder, none of which met or equaled a Listing. Under the domains, he found less than marked or no limitations.[7] (Tr. at 260-63.)

**D. ALJ's Decision**

On April 13, 2006, the ALJ issued an unfavorable decision. The ALJ concluded that plaintiff was not working and suffered from a severe impairment, i.e. a personality disorder, but that impairment did not meet or equal a Listing. (Tr. at 14). Then, adopting the opinion of the ME, the ALJ concluded that plaintiff had no exertional limitations but only a fair ability to deal with work pressure, maintain attention, concentration and appearance, and behave in an emotionally stable manner. The ALJ further found that plaintiff should avoid public contact and

---

[7]It is not clear why the SSA had Dr. Chan complete a childhood form at this time, when plaintiff was an adult.

have minimal interaction with co-workers, no strict production quotas, and no work around hazards or extremes in temperature.  (Tr. at 16.)  Because plaintiff had no past relevant work, the ALJ proceeded to step five and, relying on the testimony of the VE, concluded that plaintiff could perform jobs such as maid, hand packager and food preparation worker.  Accordingly, he found plaintiff not disabled and denied her application.  (Tr. at 18.)

As noted, the Appeals Council denied plaintiff's request for review.  (Tr. at 5).

### III.  DISCUSSION

Plaintiff argues that the ALJ (1) failed to obtain a proper waiver of her right to counsel and to fully develop the record in the absence of counsel; (2) erred in evaluating the credibility of the testimony; (3) erred in considering treating source statements; (4) failed to consider the SSA consultants' reports; (5) improperly evaluated her mental impairment; (6) made an improper RFC finding; and (7) failed to properly develop the vocational testimony.  I address each argument in turn.

### A.    Right to Counsel and Development of the Record

Plaintiff first argues that the ALJ failed to obtain a valid waiver of her right to counsel. Social security claimants have "a statutory right to counsel at disability hearings." Thompson v. Sullivan, 933 F.2d 581, 584 (7th Cir. 1991).  The claimant must be properly informed of this right and may waive it only if given sufficient information to enable her to make an intelligent decision on whether to retain a lawyer or proceed pro se.  Id.  To ensure a valid waiver of counsel an ALJ must explain (1) the manner in which an attorney can aid in the proceedings, (2) the possibility of free counsel or a contingency arrangement, and (3) the limitation on attorney fees to 25% of past due benefits and required court approval of fees.  Skinner, 478

31

F.3d at 841 (citing <u>Binion v. Shalala</u>, 13 F.3d 243, 245 (7th Cir. 1994)). If the ALJ does not obtain a valid waiver, the matter must be remanded for a new hearing unless the Commissioner can establish "that the ALJ fully and fairly developed the record." <u>Binion</u>, 13 F.3d at 245. The ALJ's duty is met if he "probes the claimant for possible disabilities and uncovers all of the relevant evidence." <u>Id.</u> If the Commissioner makes the required showing, "the plaintiff has the opportunity to rebut this showing by demonstrating prejudice or an evidentiary gap. Prejudice may be demonstrated by showing that the ALJ failed to elicit all of the relevant information from the claimant." <u>Id.</u>

In the present case, plaintiff was represented at the hearing, although not by an attorney. The Commissioner argues that the ALJ was not required to obtain a waiver under these circumstances. He casts the right as one to <u>representation</u>, not necessarily by a lawyer.[8] Although the Commissioner allows non-lawyers to represent claimants in social security proceedings, 20 C.F.R. § 404.1705,[9] the Seventh Circuit has made clear that the statutory right, which may be intelligently waived, is not simply to representation, but representation by a lawyer. <u>See</u> <u>Binion</u>, 13 F.3d at 245 (explaining that the ALJ must explain "the manner in which <u>an attorney</u> can aid in the proceedings") (emphasis added); <u>Thompson</u>, 933 F.2d at 584

---

[8]The Commissioner states that plaintiff was advised of her right to representation in the notices sent to her after her claim was denied on reconsideration (Tr. at 27-30; 391-94) and that she elected to exercise that right. However, these notices do not provide all of the information <u>Binion</u> requires, and the Commissioner does not claim that they do. <u>See also</u> <u>Skinner</u>, 478 F.3d at 841 (noting that the SSA's "the written notices . . . do not comport with this circuit's requirements for establishing a valid waiver").

[9]The relevant statute permits the Commissioner to "prescribe rules and regulations governing the recognition of agents or other persons, other than attorneys as hereinafter provided, representing claimants before the Commissioner of Social Security." 42 U.S.C. § 406(a)(1).

32

("A claimant has a statutory right to <u>counsel</u> at disability hearings.") (emphasis added). The Commissioner notes that the claimants in <u>Skinner</u>, <u>Binion</u> and <u>Thompson</u> appeared pro se, but he cites no authority for the proposition that the waiver rules announced in those cases are limited to pro se situations, and I have found none. In fact, district courts in this circuit have concluded that "the ALJ cannot presume a waiver of the right to counsel simply because the claimant appears with a non-attorney representative." <u>Koschnitzke v. Barnhart</u>, 293 F. Supp. 2d 943, 947 (E.D. Wis. 2003) (citing <u>Meroki v. Halter</u>, No. 00-C-2696, 2001 U.S. Dist. LEXIS 8479 (N.D. Ill. June 14, 2001); <u>Oyen v. Shalala</u>, 865 F. Supp. 497, 508 (N.D. Ill. 1994)). When the claimant appears without a lawyer, the "ALJ must still follow <u>Binion</u>." <u>Id.</u>; <u>see also</u> <u>Gilbert v. Secretary of Health & Human Servs.</u>, No. 3:95-cv-64RP, 1995 U.S. Dist. LEXIS 16387, at *34-35 (N.D. Ind. Sept. 1, 1995) (finding waiver invalid where the claimant appeared with a union representative and the ALJ failed to explain the manner in which an attorney could aid in the proceedings).

The Commissioner also attempts to distinguish <u>Meroki</u> and <u>Oyen</u>, arguing that the representatives in those cases were inept. However, while the <u>Meroki</u> court noted that the lay representative in that case appeared to be unqualified, it did not rest its decision on that basis. Rather, it noted that the claimant had not been advised of his right to be represented by an attorney rather than a non-attorney representative and held that his waiver of the right to an attorney was invalid. 2001 U.S. Dist. LEXIS 8479, at *21-22. Similarly, while the <u>Oyen</u> court noted that the ALJ failed to ensure that the claimant's representative knew what she was doing, it did not state that the presence of a qualified, lay representative made <u>Thompson</u> and <u>Binion</u> inapplicable. <u>See</u> 865 F. Supp. 2d at 507-08. Given the language in the Seventh Circuit's decisions in <u>Skinner</u>, <u>Binion</u> and <u>Thompson</u>, and the holdings of district courts in this circuit

33

under similar circumstances, I conclude that the ALJ must obtain a valid waiver of the claimant's right to an <u>attorney</u>, and that the appearance of a non-attorney representative does not eliminate that duty.

In any event, to the extent that a properly qualified lay representative could serve as a substitute for counsel – and obviate the need for a waiver of the right to counsel – the ALJ did not in the present case inquire into representative Phillips's qualifications.[10] Indeed, the ALJ thought Phillips <u>was</u> a lawyer (Tr. at 12), despite the fact that plaintiff indicated in her hearing request that she was "represented by Robert Phillips who is not an attorney." (Tr. at 31.) Further, while Phillips was not as clueless as the representatives in <u>Meroki</u> and <u>Oyen</u>, there is some reason to question his performance. While he did obtain additional medical records (Tr. at 350) and prepare a lengthy pre-hearing letter-brief, as plaintiff's current counsel notes, the legal argument section of that brief appears to have been cut and pasted verbatim from a treatise, complete with the page numbers and headings. (Tr. at 348.) He also cited a Grid rule that did not apply to plaintiff's situation. (Tr. at 349.) At the hearing, his questioning of plaintiff was extremely brief, covering barely one page of transcript. (Tr. at 403-04.) The representative also called plaintiff's mother, but his questioning of her took up less than two full pages of transcript. (Tr. at 405-06.) The representative had no questions at all for the ME or VE. Therefore, to the extent that the <u>Thompson</u> line of cases could be limited to situations in which the claimant appears pro se or with an ineffective representative, the result in the present case would be the same. Because the ALJ failed to ascertain the competence of plaintiff's

---

[10]The Commissioner's regulation states that a non-attorney representative must be "capable of giving valuable help to you in connection with your claim." 20 C.F.R. § 404.1705(b)(2).

34

representative or to obtain a valid waiver of plaintiff's right to counsel, the burden shifts to the Commissioner to demonstrate that the record was fully and fairly developed.

The Commissioner has not met his burden. First, the ALJ failed to conduct a thorough hearing, probing for all of the relevant evidence. The hearing lasted just thirty-one minutes (Tr. at 400; 420); the questioning of plaintiff covered barely one page of transcript, with the ALJ asking plaintiff no questions at all;[11] and the questioning of plaintiff's mother covered just two pages for "direct" by the representative and about one page of questions by the ALJ.[12] While the length or brevity of a benefits hearing is not dispositive of whether the ALJ fulfilled his obligation to adequately develop the record, Thompson, 933 F.2d at 1492, a perfunctory hearing may be indicative of such a failure, see, e.g., Henderson v. Barnhart, 205 F. Supp. 2d 999, 1010 (E.D. Wis. 2003) (finding that the Commissioner had not demonstrated a fully and fairly developed record where the hearing "was brief, almost perfunctory, lasting barely one-half hour"); Hodes v. Apfel, 61 F. Supp. 2d 798, 811 (N.D. Ill. 1999) (finding that the Commissioner did not meet his burden when the ALJ "held a perfunctory hearing during which he failed to adequately probe into the evidence"). The questioning was not probing in this case.

No one ever asked plaintiff or her mother why plaintiff could not work. No one probed into plaintiff's ability to understand, carry out and remember work-like instructions and respond appropriately to supervision, coworkers and customary work pressures in a work setting, the abilities necessary for unskilled work. See SSR 85-16. The few questions the ALJ had for plaintiff's mother focused on how the family household operated; he asked nothing at all about

---

[11]The ME and VE also asked plaintiff no questions.

[12]Again, the ME and VE had no questions for plaintiff's mother.

35

plaintiff's functioning. (Tr. at 407.) No one asked any questions about plaintiff's diabetes, despite the fact that treating source Dr. Hayden opined that plaintiff's hyperglycemia may be contributing to her fatigue, excessive sleep and low motivation.[13] (Tr. at 308.) Likewise, neither the ALJ or the representative asked plaintiff or her mother about plaintiff's glucophage treatment or any possible side effects of that medication.[14] Neither the ALJ or the representative asked plaintiff or her mother about the effects of plaintiff's obesity, despite references in the record to difficulty lifting and walking.[15] (Tr. at 63.) Nor did the representative suggest or the ALJ obtain a consultative physical examination.

The Commissioner contends that plaintiff has not demonstrated that further exploration of any of these areas would have an effect on the outcome. However, this misunderstands the burden. Only after the Commissioner has demonstrated full and fair development of the record is the plaintiff required to demonstrate prejudice or an evidentiary gap. See Binion, 13 F.3d at 245 (explaining that this shifting of the burden is necessary to give "teeth" to the waiver requirement); see also Blom, 363 F. Supp. 2d at 1053 (stating that the Commissioner cannot meet his burden by arguing that the claimant has not brought forth "missing evidence"); Young v. Apfel, No. 98- CV-206, 1999 U.S. Dist. LEXIS 7616, at *28 (N.D. Ind. May 19, 1999) ("The Commissioner cannot fulfill that burden by simply arguing that the claimant is speculating about

---

[13]Dr. Parikh also opined that plaintiff's low energy levels may reflect other medical conditions. (Tr. at 239.)

[14]The Commissioner notes that Dr. Tarrand discussed limitations based on medication side effects, which the ALJ adopted. However, these limitations appeared to be based on plaintiff's psychotropic medications.

[15]SSR 02-1p directs the ALJ to consider the extent to which the claimant's obesity interferes with her ability to stand, walk and lift.

36

the type and effect of missing evidence.").

The Commissioner further argues that the ALJ fully explored plaintiff's impairments with ME Tarrand, a medical doctor. However, it is clear from the record that Dr. Tarrand considered only plaintiff's mental impairments; she did not consider plaintiff's diabetes or obesity. Further, as a non-examining consultant,[16] the ALJ could not assume that Dr. Tarrand possessed full knowledge of these conditions. Thus, the Commissioner's reliance on Skarbek v. Barnhart, 390 F.3d 500, 504 (7th Cir. 2004) is misplaced, for in that case the ALJ's failure to directly discuss the claimant's obesity was cured by his adoption of limitations suggested by the specialists and reviewing doctors who were aware of the claimant's obesity.

Therefore, because the ALJ failed to obtain a valid waiver of counsel, and the Commissioner has not demonstrated full and fair development of the record, the matter must be remanded for re-hearing.

## B.    Credibility

Plaintiff next argues that the ALJ erred in finding her and her mother's testimony "not entirely credible." (Tr. at 16.) While the reviewing court may not second guess the ALJ's assessment of the witnesses, the ALJ must sufficiently articulate the reasons for his credibility determination in order to permit meaningful judicial review. Lopez v. Barnhart, 336 F.3d 535, 539-40 (7th Cir. 2003) (citing SSR 96-7p). Those reasons must be specified in the ALJ's decision; they may not be implied or supplied later by the Commissioner's lawyers. Golembiewski v. Barnhart, 322 F.3d 912, 916 (7th Cir. 2003). Further, the ALJ must comply with the requirements of SSR 96-7p in evaluating credibility. Brindisi v. Barnhart, 315 F.3d 783,

---

[16]It is also worth noting that the ME appeared with the ALJ in Houston, Texas, via video-link, and thus was never even in the same room as plaintiff.

787 (7th Cir. 2003).

SSR 96-7p establishes a two-step process for evaluating the claimant's testimony and statements about symptoms such as pain, fatigue or weakness.  First, the ALJ must consider whether the claimant suffers from a medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms. If not, the symptoms cannot be found to affect the claimant's ability to work. SSR 96-7p.  Second, if an underlying impairment that could reasonably be expected to produce the claimant's symptoms has been shown, the ALJ must determine the extent to which the claimed symptoms limit her ability to work.  In making this determination, the ALJ must consider the medical evidence along with the claimant's daily activities; the location, duration, frequency and intensity of the pain; precipitating and aggravating factors; the type, dosage, effectiveness and side effects of any medication the claimant uses; treatment other than medication; any measures the claimant has used to relieve the pain or other symptoms; and functional limitations and restrictions.  20 C.F.R. § 404.1529(c)(3); SSR 96-7p.  While the ALJ need not elaborate on each of these factors when making a credibility determination, he must sufficiently articulate his assessment of the evidence to assure the court that he considered the important evidence and to enable the court to trace the path of his reasoning.  Windus v. Barnhart, 345 F. Supp. 2d 928, 946 (E.D. Wis. 2004).   A conclusory statement that the claimant's allegations have been considered, or are (or are not) credible will not suffice.  SSR 96-7p.

In the present case, the ALJ stated: "After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, duration and limiting effects of these symptoms are not entirely credible."  (Tr. at 16,

38

emphasis in original.)[17]  In support of this conclusory statement, the ALJ stated that plaintiff was capable of controlling her personality disorder as evidenced by her conduct in school; her reported daily activities were not shown to be consistent with her claim of disability; plaintiff denied performing household chores because her mother did them for her and engaged in no other activities (aside from watching TV) due to lack of interest, not inability to perform them; and plaintiff was not receiving frequent treatment, which undermined her allegations of incapacitating symptoms.  (Tr. at 16-17.)  This is insufficient.

First, the perfunctory nature of the hearing, and particularly the limited testimony from plaintiff and her mother, leaves me with little confidence that the ALJ considered a full and fair testimonial record in evaluating credibility.

Second, the ALJ failed to consider a great deal of relevant evidence in determining credibility.  For example, while the ALJ stated that plaintiff had not received frequent treatment, the record demonstrates that she was prescribed powerful psychotropic medications and at one point was hospitalized after threatening her mother's boyfriend with a hammer, evidence the ALJ did not comment upon in discussing credibility. The ALJ also seemed to overlook the steady psychiatric treatment plaintiff received from several providers.[18]   Nor did the ALJ

---

[17]I note that this credibility finding is identical to that produced by another Houston ALJ in a different case I recently decided, right down to the underscoring.  Acevedo v. Astrue, No. 06-C-855, slip op. at 16 (E.D. Wis. May 24, 2007).

[18]In his brief, the Commissioner notes that plaintiff's doctors opined that her problems stemmed from her chaotic home life rather than mental illness and expressed doubts about the value of mental health treatment and medications. (Commissioner's Br. at 21-22.)  However, the ALJ did not provide this as a reason for his credibility finding, and principles of administrative law require the ALJ to rationally articulate the grounds for his decision and confine judicial review to the reasons supplied by the ALJ.  The ALJ, not the Commissioner's lawyers, must build an accurate and logical bridge from the evidence to the conclusion.  Steele, 290 F.3d at 941.

39

comment on the written forms completed by plaintiff, her mother and a friend documenting plaintiff's limitations in self-care (Tr. at 59; 81-82), housework (Tr. at 60-61; 82), getting around (Tr. at 61; 83), handling money (Tr. at 61; 83), getting along with others (Tr. at 62; 84) and following instructions (Tr. at 63).[19]

Third, the ALJ stated that plaintiff's daily activities were inconsistent with her claim but provided no explanation how.[20] See Zurawski v. Halter, 245 F.3d 881, 887 (7th Cir. 2001) (reversing credibility determination where ALJ failed to explain how daily activities were inconsistent with the claimant's allegations). Moreover, this finding is contradicted by the next one – that plaintiff did very little during the day (due to lack of interest and/or the indulgence of her mother).

Therefore, for all of these reasons, the matter must be remanded for re-evaluation of

---

[19]The Commissioner claims that the ALJ considered those reports based on his citation of Exhibit 1E, which contained the reports, in the decision. (Tr. 17.) However, exhibit 1E consists of 87 pages of disability related development documents. (Tr. at 2.) Simply citing the exhibit provides no assurance that all of the documents within it were considered. It is of course true that the ALJ need not comment in writing on every piece of evidence. However, his decision must assure the court that he considered the important evidence. See, e.g., Godbey v. Apfel, 238 F.3d 803, 808 (7th Cir. 2000).

[20]Earlier in the decision, the ALJ stated that plaintiff's activities included eating, sleeping, reading novels, watching television, cleaning and taking care of personal hygiene. (Tr. at 16.) At the hearing, when asked what she did during the day, plaintiff testified: "eat, sleep, watch TV, read my romance novel. When she tells me to I clean up my messes. If she doesn't I don't." (Tr. at 404.) She stated that she had to be reminded to "clean [her]self, pick up dirty clothes, pick up [her] dishes, brush [her] teeth, wash [her] hair." (Tr. at 404.) She denied washing dishes. (Tr. at 404.) Thus, the ALJ's recitation of activities did not quite match the testimony. In any event, it is hard to see how these activities are incompatible with plaintiff's claim of disability. See, e.g., Elbert v. Barnhart, 335 F. Supp. 2d 892, 910-11 (E.D. Wis. 2004) (rejecting credibility determination based on minimal daily activities such as socializing with family, going to the corner store, taking public transportation and living alone with assistance); Mason v. Barnhart, 325 F. Supp. 2d 885, 903-05 (E.D. Wis. 2004) (rejecting reliance on activities like performing self-care, driving, listening to music, watching TV and reading).

40

credibility.

## C.    Treating Source Statements

Plaintiff next argues that the ALJ failed to properly consider the reports from her treating mental health professionals, Drs. Parikh and Hayden.  Under SSA regulations, reports prepared by the claimant's treating medical professional are entitled to special consideration. Dominguese v. Massanari, 172 F. Supp.2d 1087, 1100 (E.D. Wis. 2001).  If the report is well-supported by medically acceptable clinical and laboratory diagnostic techniques and "not inconsistent" with other substantial evidence, the ALJ must afford it controlling weight.  Id. (citing SSR 96-8p).  Even if the ALJ finds that the report is not entitled to controlling weight, he may not simply reject it.  SSR 96-2p.  Rather, he must evaluate the opinion's weight by looking at the length, nature and extent of the claimant's and physician's treatment relationship; the degree to which the opinion is supported by the evidence; the opinion's consistency with the record as a whole; whether the doctor is a specialist; and "other factors."  20 C.F.R. § 404.1527(d). "Regardless of the weight the ALJ ultimately gives the treating source opinion, she must always 'give good reasons' for her decision."  Wates, 274 F. Supp. 2d at 1034 (quoting 20 C.F.R. § 404.1527(d)(2)).

Plaintiff first argues that while the ALJ generally mentioned Dr. Parikh's report, he failed to afford it any particular weight.  Specifically, the ALJ failed to consider Dr. Parikh's opinion that plaintiff would have a poor ability to respond to supervision, co-workers and routine work pressures due to her egocentric, rebellious and oppositional personality style.  (Tr. at 240.) The Commissioner responds that the ALJ's RFC limiting plaintiff to work requiring minimal interaction with others, no strict production quotas and simple tasks accounted for plaintiff's limitations in these areas.  He further argues that it was reasonable for the ALJ to adopt Dr.

41

Tarrand's opinion that plaintiff had a fair ability to deal with work pressures; he also notes that Dr. Parikh's opinion was not consistent with Dr. Hayden's view that plaintiff could behave in a more emotionally stable manner. Finally, he argues that Dr. Tarrand's review of the record included treatment notes post-dating Dr. Parikh's July 2004 report, giving her a more complete understanding of plaintiff's condition. These are all good arguments, but the ALJ did not make them. Absent some indication from the ALJ, I cannot assume that he rejected Dr. Parikh's opinion on this issue, ignored it or simply overlooked it. See Zblewski v. Schweiker, 732 F.2d 75, 79 (7th Cir. 1984) ("As the Third Circuit put it in Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981), when the ALJ fails to mention rejected evidence, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'"). Further, because the ability to "respond appropriately to supervision, coworkers, and customary work pressures in a work setting" is essential to unskilled work, SSR 85-16, I cannot assume that the error was harmless. Thus, the ALJ will have to consider this report on remand.

Plaintiff also argues that the ALJ erred in evaluating the opinions of Dr. Hayden. The ALJ noted Dr. Hayden's assessment of plaintiff's ability to be reliable and get along with others but adopted the ME's assessment, stating that Dr. Tarrand's testimony was credible, consistent with the objective evidence and best summarized the record. (Tr. at 15-16.) It is not entirely clear how different Dr. Hayden's and Dr. Tarrand's opinions are. In his primary report, Dr. Hayden generally rated plaintiff's abilities as fair to good. (Tr. at 45-46.) In some areas he wrote, "no relevant findings." (Tr. at 46.) Dr. Tarrand generally rated plaintiff's abilities as "fair" (Tr. at 411), although she apparently used a somewhat different definition of "fair" than did Dr. Hayden (Tr. at 413). Given what appear to be relatively minor differences between the two opinions, I cannot conclude that the ALJ committed reversible error in this regard. Further, the

42

VE testified that neither Dr. Tarrand's profile or Dr. Hayden's assessment in his August 2, 2004 report would preclude work at the unskilled level. (Tr. at 416.)

## D. SSA Consultants' Reports

Plaintiff next argues that the ALJ erred in skipping the report of Dr. Fogle, who evaluated her in December 2001 and diagnosed a learning disorder, oppositional defiant disorder and mood disorder, with a GAF of 40. Dr. Fogle also indicated that plaintiff had significant difficulty relating to others, coping with normal stress and maintaining an emotionally stable demeanor. (Tr. at 178-79.) Plaintiff further argues that the ALJ should have evaluated the reports of the state agency consultants on the 2001 application, Drs. Rattan and Warrior. The Commissioner responds that these reports all pre-date the alleged disability onset date in the current application, that the ALJ reviewed sufficient pre-2003 evidence to get a complete picture of plaintiff's situation, and that the ALJ need not discuss in writing every piece of evidence.

It is well-established that evidence from a prior application, even if not re-opened, can be relevant to a claim of disability with a later onset date. See, e.g., Hamlin v. Barnhart, 365 F.3d 1208, 1215 (10th Cir. 2004) (citing Groves v. Apfel, 148 F.3d 809, 810-11 (7th Cir. 1998); Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 193 (1st Cir. 1987)); Tate v. Apfel, 167 F.3d 1191, 1194 n.2 (8th Cir. 1999) (citing Burks-Marshall v. Shalala, 7 F.3d 1346, 1348 n.6 (8th Cir. 1993)). Thus, ALJs should not ignore medical reports simply because they pre-date the alleged onset of disability. See Lackey v. Barnhart, 127 Fed. Appx. 455, 458-59 (10th Cir. 2005); Hamlin, 365 F. 3d at 1215-16; see also 20 C.F.R. § 404.1527(d) ("Regardless of its source, we will evaluate every medical opinion we receive."); SSR 96-9p (stating that ALJs may not ignore the reports of state agency consultants "and must explain the weight given to these opinions in their decisions"). While the reports of Drs. Rattan and Warrior do not appear to

43

differ substantially from the opinion of Dr. Tarrand, which the ALJ adopted, Dr. Fogle's report does appear to support substantially greater limitations. Further, unlike Drs. Tarrand, Rattan and Warrior, Dr. Fogle actually examined plaintiff. Finally, there is no indication in the record that plaintiff's condition changed substantially between December 2001 (when Fogle examined her) and October 2003 (the relevant onset date), which could render Dr. Fogle's report irrelevant. Thus, the ALJ will have to determine the weight, if any, this report deserves on remand.

Plaintiff next faults the ALJ for failing to discuss the reports of the state agency consultants on the 2003 application. As with the other consultants' reports, the ALJ failed to mention these opinions, a clear violation of SSR 96-9p. The Commissioner responds that Dr. Tarrand reviewed those reports – which do not, in any event, appear to support plaintiff's claim – and that the ALJ reasonably relied on Dr. Tarrand's overall analysis. Perhaps the error was harmless, given that these reports do not appear to differ substantially from Dr. Tarrand's opinion. Nevertheless, the ALJ should consider them on remand, and plaintiff may draw attention to those portions she believes support her claim.

**E. Evaluation of Mental Impairment**

Plaintiff next argues that the ALJ failed to apply the special technique applicable to review of mental impairments. He further notes that Dr. Tarrand offered only a bottom line opinion that plaintiff did not meet a Listing, and she was never asked for specific opinions on the B and C criteria. The Commissioner concedes that the ALJ did not cite the special technique directly, but he did discuss the evidence of record pertaining to the functional areas pertinent to the technique and adopted the opinion of Dr. Tarrand, who applied it. The Commissioner further contends that the ALJ reviewed the opinions of the state agency

44

consultants, Drs. Spears and Bauer, who applied the technique.  Therefore, he argues that the ALJ's error was harmless.

An ALJ's obligation to follow the special technique may be satisfied by his adoption and incorporation of the report of a consultant who applied the technique.  See David v. Barnhart, 446 F. Supp. 2d 860, 877 (N.D. Ill. 2006).  A "meticulous level of annotation" is unnecessary. Id.  However, in the present case, the ALJ never mentioned the reports of Drs. Spears and Bauer, and Dr. Tarrand made no specific findings on the B and C criteria.  It may well be that the result will be the same, but because the matter must be remanded anyway, the ALJ should on remand revisit his application of the special technique, as it pertains to the Listings and RFC, based upon the entire record and consistent with this decision.

## F.    Vocational Testimony

Finally, plaintiff argues that the VE's testimony was flawed and undeveloped.  As an initial matter, she questions the qualifications of the VE.  However, because she failed to object to the VE's certification as an expert below, the argument is waived.  See Donahue v. Barnhart, 279 F.3d 441, 446 (7th Cir. 2002) (holding that absent an objection the ALJ is entitled to rely on the VE); Union Tank Car Co., Inc. v. Occupational Safety & Health Admin., 192 F.3d 701, 707 (7th Cir. 1999) ("Failure to present an argument to the ALJ does constitute waiver of the right to raise it on appeal . . . .").  Likewise, plaintiff's argument that the ALJ failed to establish a foundation for the VE's testimony is waived by failure to object below.  See Donahue, 279 F.3d at 446 ("When no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion[.]"); cf. McKinnie v. Barnhart, 368 F.3d 907, 910-11 (7th Cir. 2004) (reversing where the claimant challenged the VE's reliability at the hearing, and the ALJ failed to make an inquiry).

45

It could be argued that plaintiff's lack of counsel at the hearing should excuse her waiver of these arguments. However, plaintiff is now represented by a lawyer, and she fails to develop an argument that the VE was unqualified, and the transcript reveals that the ALJ sufficiently questioned him as to the basis for his conclusions.[21] (Tr. at 415-18.)

Plaintiff also argues that the substance of the VE's testimony was bogus. First, the VE claimed that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"), yet the DOT does not contain most of the limitations set forth in the ALJ's questions. However, as the Commissioner notes, the VE was not claiming that his testimony precisely paralleled the DOT. Rather, the VE was certifying that there were no conflicts between his testimony and the DOT, as SSR 00-04p requires. As the Commissioner also correctly notes, if all of the conditions contained in the ALJ's hypothetical were set forth in the DOT, there would be no need for a VE; the ALJ could just look up the numbers himself. The purpose of the VE is to help the ALJ and provide more specific information about jobs than the DOT. Second, plaintiff challenges the VE's statement that his numbers came for the Department of Labor, which she claims was not possible because the Department stopped using the DOT years ago in favor of the "O*NET." However, it appears that the VE derived this data from the Bureau of Labor Statistics (Tr. at 417), and plaintiff does not contend that this source is unreliable. Finally, noting the VE's testimony that plaintiff should have an opportunity to work initially in a sheltered workshop or work adjustment program, plaintiff argues that the ALJ erred in failing to recognize that sheltered work is not presumed to be substantial gainful activity. However, the VE stated that in an "ideal world" it would be best if plaintiff transitioned into work, since she had never

---

[21]Likewise, I cannot conclude that the few portions of the VE's testimony marked "inaudible" in the transcript render his testimony unreliable.

held a job before.  The VE did not testify that sheltered work was <u>all</u> plaintiff could do.  Thus, plaintiff has failed to demonstrate reversible error in the VE testimony.  Nevertheless, given the other errors noted in this decision, the ALJ on remand will have to revisit the issue of plaintiff's ability to work with a VE.

## IV.  CONCLUSION

**THEREFORE, IT IS ORDERED** that the Commissioner's decision is **REVERSED**, and this matter is **REMANDED** for further proceedings consistent with this decision.  The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 26th day of June, 2007.


/s Lynn Adelman
_____
LYNN ADELMAN
District Judge

47